Freddie Lee WRIGHT, Petitioner-Appellant,

v.

Joe HOPPER, Respondent-Appellee.

No. 97-6646.

United States Court of Appeals,

Eleventh Circuit.

March 10, 1999.

Appeal from the United States District Court for the Southern District of Alabama. (No. 94-0696-AH-M), Alex T. Howard, Judge.

Before BIRCH, DUBINA and BARKETT, Circuit Judges.

DUBINA, Circuit Judge:

Petitioner, Freddie Lee Wright ("Wright"), appeals the district court's order denying his petition for a writ of habeas corpus. Wright was convicted and sentenced to death for the December 1, 1977, robbery and murders of Warren and Lois Green ("the Greens" or "the victims"), at the Western Auto Store in Mt. Vernon, Alabama. After reviewing the entire record in this case, and having the benefit of oral argument and the parties' briefs, we affirm the judgment of the district court.

## I. BACKGROUND

A.    *Facts*

The facts are recited verbatim from the opinion of the Alabama Court of Criminal Appeals on direct review of Wright's conviction and sentence.

> The State presented evidence that around 10:30 on the morning of December 1, 1977, Mr. Green had cashed checks in the amount of $900 at a local bank and placed the money in a red bank bag. Shortly before noon, it was discovered that Mr. and Mrs. Green had been tied together and shot in their Western Auto Store in Mount Vernon. The money was missing from the cash register, and a television, a stereo component system, and several watches were also missing from the store. Mr. Green was not wearing the Seiko watch he had been wearing earlier that morning. His family had given him this watch as a birthday present on November 30, 1977.

> Doris Lacey Lambert testified that, on the 2nd day of December of 1977, the defendant told her that "he had went out with some of his friends," "Craig, Roger, and 'Gill Man,' " to Mount Vernon and that "he killed two people" with a gun in a Western Auto Store.

On cross examination, Ms. Lambert admitted that she had one child by the defendant but denied making the statement that "before she would see another woman have him she would see him dead" after she learned that the defendant was engaged to another woman. She admitted that she had been convicted of shoplifting.

Roger McQueen testified that he had been convicted of armed robbery and was going to plead guilty to first degree murder for the Mount Vernon killings. He "considered himself a guilty participant in this murder." McQueen stated that he and Craig lived in the same apartment complex in Mobile. On December 1, 1977, they took Craig's car and picked up the defendant and Tinsley. About one week before, at his suggestion, a decision had been made between him and Craig "to rob some store in Jackson." The defendant and Tinsley learned of the plan and agreed to go. On the way to Jackson, they stopped in Mount Vernon to get some tape to repair a torn seat in Craig's car.

McQueen went in the Western Auto Store to purchase the tape. Wright came in later armed with a gun and told Mr. and Mrs. Green to come out from behind the desk into a "little room." The defendant told McQueen "to go to the register" and Tinsley entered the store. McQueen removed the money from the register and Tinsley, at the defendant's direction, got some extension cord to tie up Mr. and Mrs. Green. The defendant and Tinsley then tied up the Greens. The defendant made several trips from the store to Craig's car and took a T.V. set and a stereo system. Tinsley took the watches. The defendant also had Mr. Green's watch. McQueen also testified that Craig told him to "make sure the people were taken care of" because "the people would have identified the car." The defendant was the last one to leave the store. When he returned to Craig's car, the others "asked him what took place and he said that he had took care of both peoples." * * * "He said he had shot both peoples and also Reginald Tinsley agreed with him because he went back into the store the last time." McQueen asked the defendant to show him the empty cartridges if the defendant shot both people and the defendant handed McQueen "two empty cartridge[s] from the gun." The gun was a "nickel plate .38 with some kind of carving handle, a wooden handle." McQueen testified that they left Mount Vernon and went to Craig's sister's house where they divided the money he had taken from the store. The defendant gave the T.V. to Craig and the stereo was taken to where the defendant "stayed at." McQueen left the "bank carrier" that he had taken at Craig's sister's house.

Percy Craig testified that he had been convicted for "possession", forgery, and burglary. He admitted his participation in this offense under review as "the driver" and testified that he intended to plead guilty to a charge of murder. Craig substantially corroborated McQueen's testimony.

Craig testified that, when McQueen returned to the car after having been in the store, either Tinsley or the defendant asked him "how did it look inside." He admitted that he asked his three companions "if everything had been taken care of" because "they were in and out of the store so fast I wanted to be sure that the people were tied up to give me enough time to get away." After they left the store, the defendant gave McQueen "a couple of empty cartridges ... to throw out of the window." Craig then asked if he shot the people and the defendant said yes. Craig testified that a couple of days after the robbery he saw the defendant with a Seiko watch that was subsequently identified as having been Mr. Green's. Craig said that the defendant gave the watch to Joe Nathan Beckham who pawned the watch.

Other witnesses for the State identified the Seiko watch. It was established that this watch was pawned by Joe N. Beckham at Buster's Eagle Pawn Shop in Mobile on January 16, 1978.

2

Expert testimony presented by the State established that Mr. and Mrs. Green were both shot once in the head with a .38 caliber bullet and that the bullet recovered from Mr. Green's head could have been fired from a pistol recovered directly behind the defendant's apartment. The bullet that had killed Mrs. Green was too mutilated to compare.

The defendant was arrested at the Stone Oaks Apartment on July 28, 1978. He was living with Hazel Craig, who, when the deputies asked, denied that the defendant was home. The officers searched the apartment and found the defendant in a bedroom. Later, a .38 caliber revolver was recovered on the ground next to an air conditioning unit at the rear of the apartment. Although the ground was damp, apparently from the early morning mist or dew, the gun was "perfectly dry" and "had what appeared to be a fine coating of lint material on the gun itself."

*Wright v. State,* 494 So.2d 726, 733-35 (Ala.Crim.App.1985).

B.      *Procedural History*

Wright's first trial ended in a mistrial, but a Mobile County Grand Jury re-indicted him for the capital offenses of "[r]obbery or attempts thereof, when the victim is intentionally killed by the defendant" and "[m]urder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts." *See* Ala.Code § 13-11-2(a)(2) (1975) (repealed and replaced, § 13A-5-40(a)(2)) and Ala.Code § 13-11-2(a)(10) (1975) (repealed and replaced, § 13A-5-40(a)(10)). After a two-day trial, the jury found Wright guilty of both counts and set his punishment at death. After a separate sentencing hearing, the trial court imposed the death sentence.

On direct appeal, the Alabama Court of Criminal Appeals reversed and remanded the case on the authority of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Ritter v. State,* 403 So.2d 154 (Ala.1981). The Alabama Court of Criminal Appeals denied the State's application for rehearing and the Alabama Supreme Court then denied the State's petition for writ of certiorari. *See Wright v. State,* 407 So.2d 565 (Ala.1981). The United States Supreme Court granted the State's petition for writ of certiorari, vacated the judgment of the Alabama Court of Criminal Appeals, and remanded the case to the Alabama Court of Criminal Appeals for reconsideration in light of *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). *See Alabama v. Wright,* 457 U.S. 1114, 102 S.Ct. 2920, 73 L.Ed.2d 1325 (1982).

After remand by the United States Supreme Court, the Alabama Court of Criminal Appeals affirmed Wright's conviction and sentence of death. *See Wright v. State,* 494 So.2d 726. The Alabama Supreme Court affirmed. *See Wright v. State,* 494 So.2d 745 (Ala.1986). The Alabama Supreme Court denied Wright's application for rehearing and the United States Supreme Court denied Wright's petition for writ of certiorari. *Wright v. Alabama,* 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).

Wright filed a petition for writ of error coram nobis in the Mobile County Circuit Court on June 22, 1987. After conducting an evidentiary hearing on the petition, the trial court denied Wright coram nobis relief. The Alabama Court of Criminal Appeals affirmed the trial court's decision. *See Wright v. State,* 593 So.2d 111 (Ala.Crim.App.1991). On January 31, 1992, the Alabama Supreme Court denied Wright's application for writ of certiorari and the United States Supreme Court denied certiorari review. *See Wright v. Alabama,* 506 U.S. 844, 113 S.Ct. 132, 121 L.Ed.2d 86 (1992).

Wright then filed his federal habeas corpus petition. After conducting an evidentiary hearing on Wright's allegations, the district court denied Wright habeas relief.

## II. ISSUES

1. Whether the State's failure to produce certain items of evidence violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. Whether Wright received ineffective assistance of counsel because counsel failed to investigate another person's arrest and indictment for the same crime; failed to challenge the State's alleged use of peremptory challenges to strike all black members from the venire and failed to raise this issue on direct appeal; and failed to object to the admission of misleading information in Wright's pre-sentence investigation report.

3. Whether Wright established a *prima facie* violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and whether Wright's *Batson* claims are procedurally barred because counsel

4

did not raise an objection at trial under *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

4. Whether the preclusion clause in Alabama's former Death Penalty Act unconstitutionally prevented the instruction of a lesser included offense in this case.

5. Whether Wright is entitled to relief on the remaining claims presented to the district court.

## III. STANDARDS OF REVIEW

We review the district court's grant or denial of habeas corpus relief *de novo.* *See Byrd v. Hasty,* 142 F.3d 1395, 1396 (11th Cir.1998). "A district court's factual findings in a habeas corpus proceeding are reviewed for clear error." *Id.* at 1396. An alleged *Brady* violation presents a mixed question of law and fact, which this court reviews *de novo.* *See Duest v. Singletary,* 967 F.2d 472, 478 (11th Cir.1992). We also review *de novo* the district court's determination that Wright is procedurally barred from raising some of his claims in federal court and its application of the cause and prejudice rules to the procedural bar issues. *See Lusk v. Singletary,* 112 F.3d 1103, 1105 (11th Cir.1997), *cert. denied,* --- U.S. ----, 118 S.Ct. 894, 139 L.Ed.2d 880 (1998). An ineffective assistance of counsel claim is a mixed question of law and fact which we review *de novo.* *See Dobbs v. Turpin,* 142 F.3d 1383, 1386 (11th Cir.1998).

## IV. DISCUSSION

A. *Brady* claim

Wright contends that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, when it withheld several crucial items of evidence. These items include the testimony of Mary Johnson ("Johnson") which placed Theodore Otis Roberts ("Roberts") at the Western Auto Store shortly before the murders ("the Johnson testimony"); an affidavit of Detective Stroh that declared that Roberts's girlfriend had stated that a handgun belonging to Roberts was the weapon that was used to kill the Greens ("the Stroh affidavit"); evidence that Doris Lambert, Wright's former girlfriend and witness for the State at trial, had a history of poor mental health and drug use ("Lambert evidence"); and evidence that the State and Roger

5

McQueen, a member of the robbery team and witness for the State, entered a secret agreement that provided lenient treatment for McQueen if he testified against Wright at trial ("McQueen agreement"). The district court found all but the Johnson testimony to be procedurally barred from federal court review.

In order to establish a violation of *Brady,* Wright must demonstrate:

(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence) ...; (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence ...; (3) that the prosecution suppressed the favorable evidence ...; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different....

*United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.1989) (citations omitted). For *Brady* purposes, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stewart,* 820 F.2d 370, 374 (11th Cir.1987) (citation and internal quotation marks omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

1.     The Johnson testimony

Mary Johnson reported to the police that she entered the Western Auto Store shortly before the robbery-murders. As she entered, she observed a blue automobile with several people in it. When she left the store, she met a person entering, and she observed the same blue automobile parked nearby with three people in the back seat and one person in the front seat. When she learned of the murders, she gave the police a description of the person she had seen entering the store. She subsequently identified a photograph of the person she saw and later identified the same person in a police line-up. The person she identified in both instances was Roberts, who bears a striking resemblance to Roger McQueen. The automobile Percy Craig drove on the day of the robbery-murders was blue. In light of this information, the State filed charges against Roberts and Mary Johnson testified at the preliminary hearing. Roberts was indicted, but the State dropped

6

the charges after the prosecutors concluded that Johnson had misidentified him. *See Wright v. State,* 593 So.2d at 115.

Wright argued in his error coram nobis petition that the State suppressed the preliminary hearing testimony of Mary Johnson in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. After conducting an evidentiary hearing, the trial court concluded that the State did not suppress evidence pertaining to Mary Johnson's identification of Roberts. On appeal, the Alabama Court of Criminal Appeals affirmed, holding that the record adequately supported the trial court's findings. The court noted that Wright's trial counsel was aware that the State had charged Roberts with the crimes prior to Wright's trial; that the preliminary hearing in Roberts's case was a matter of public record; and that the local newspapers extensively reported the substance of Johnson's testimony prior to Wright's trial. The court also found that the evidence was not material. *See Wright v. State,* 593 So.2d at 115-16.

The district court determined that the testimony of Al Pennington ("Pennington"), Wright's trial counsel, at the federal evidentiary hearing and the state court's factual findings supported the conclusion that the Johnson testimony did not violate *Brady.* We agree. The State did not suppress the evidence. Pennington testified that he knew that Roberts had been indicted for the crime, and he knew of Mary Johnson's existence because he placed her on the defense's witness list. ROA, Vol. 8, p. 83. Although the Johnson testimony was not part of Roberts's official court record, nothing prevented Pennington from discovering the transcript or interviewing Mary Johnson to discern the crux of her testimony. In light of this and the fact that the State is not required to furnish a defendant with exculpatory evidence that is fully available through the exercise of due diligence, we conclude there was no *Brady* violation. *See United States v. McMahon,* 715 F.2d 498, 501 (11th Cir.1983).

Assuming *arguendo* that the Johnson testimony was suppressed by the State, Wright argues that this evidence was material because it showed that another individual may have committed the crime and this evidence would have raised serious questions about the credibility of Craig and McQueen's testimony. Thus,

7

the evidence could have changed the outcome of the trial. There is one fatal flaw with Wright's argument. The Johnson testimony would not have changed the outcome of the trial because it did nothing to indicate that Wright was not present at the crime scene, and it did nothing to contradict Craig and McQueen's testimony that Wright was the triggerman. Additionally, in contrast to Wright's argument, the Johnson testimony would not have impeached Craig and McQueen because they were each impeached on several grounds and neither one ever mentioned that Roberts was a participant in the crime. Moreover, Wright never mentioned Roberts to his ex-girlfriend Doris Lambert when he implicated McQueen, Craig, Tinsley, and himself in the murders. The defense would have had a remote chance of convincing the jury that Roberts was involved in the murders. Accordingly, the Johnson testimony had no bearing on the essential facts that resulted in Wright's conviction, and therefore, the testimony could not have changed the outcome of the trial. In sum, we conclude that the Johnson testimony was neither suppressed nor material, and therefore, there was no *Brady* violation.

2.      The remaining items of evidence

The district court concluded that the remaining items of allegedly exculpatory evidence—the Stroh affidavit, the Lambert evidence, and the McQueen agreement—were all procedurally defaulted because the petitioner failed to raise these claims in the state court. The failure to raise these claims to the state courts is a procedural default that bars federal habeas review of the claims. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A federal court will consider the claims, however, if the petitioner can show "cause and prejudice" for his procedural default or that failure to consider his claims will result in a fundamental miscarriage of justice. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The district court evaluated both exceptions to the doctrine of procedural default and found that cause existed, but that Wright had not proved prejudice to overcome the procedural default. The district court also determined that the fundamental miscarriage of justice exception was not applicable.

8

To establish "cause" for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court. *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The district court found cause to exist because the record demonstrates that the State was in possession of the Stroh affidavit, the Lambert evidence, and the McQueen agreement, and did not disclose these materials to the defense. Thus, the district court concluded that the State prevented Wright from raising these claims in the state courts. The record does not support this finding. Wright presented no evidence indicating that the State's post-conviction counsel did anything to suppress the above-referenced items or did anything to impede Wright from learning about these items of evidence. However, the district court's correct finding that there was no prejudice pretermits a more lengthy discussion on why cause was not proven by Wright.

In order to establish prejudice, Wright must show that the items of evidence were material; that is, that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Blackmun, J.). Wright fails to make this showing.

a.      The Stroh affidavit.

This affidavit declares that Roberts's girlfriend stated to Detective Stroh that a handgun belonging to Roberts was the weapon that was used to kill the Greens during the robbery. Even if the State had disclosed the affidavit to the defense, it would not have been admissible at trial because it is hearsay. The defense easily could have called Roberts's girlfriend to testify at trial regarding her alleged statement to Detective Stroh.

Inadmissible evidence may be material if the evidence would have led to admissible evidence. *See Spaziano v. Singletary,* 36 F.3d 1028, 1044 (11th Cir.1994).[1] Wright has failed to show that the affidavit

---

[1] In *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995), the Supreme Court considered the question whether inadmissible evidence may be material under *Brady.* In that case, the Supreme Court reviewed a holding of the Ninth Circuit Court of Appeals that an inadmissible polygraph

would have led to admissible evidence because he did not call Roberts's girlfriend as a witness at the federal evidentiary hearing. Therefore, it is unknown exactly what she would say, and accordingly, Wright has failed to prove that what she would say is material. A court cannot speculate as to what evidence the defense might have found if the information had been disclosed. *Wood,* 116 S.Ct. at 11. The crucial inquiry is whether there is evidence in the record that establishes a "reasonable probability" that the production of the inadmissible evidence would have resulted in a different outcome at trial. *Id.* at 10. There is no such evidence in this record. Since the evidence is not likely to have changed the outcome of his trial, Wright has not shown prejudice to overcome his procedural default.

b.      The Lambert evidence.

The District Attorney's office had Doris Lambert's mental health records but did not give them to Wright's lawyers. The district court found that this evidence was not admissible under Alabama law, and accordingly, was not material. Wright argues that the evidence was material because the case against him centered upon Doris Lambert's credibility and the evidence of her mental health and drug use could have been used at trial to impeach her credibility.

Under Alabama law, Lambert's mental health records and reported drug use would not have been admissible at Wright's trial. In Alabama, a prosecutor or defense attorney cannot use evidence of drug use to impeach a witness unless it is shown that the drugs affect the reliability of the witness's testimony. See *Leonard v. State,* 551 So.2d 1143, 1147 (Ala.Crim.App.1989). Moreover, "[t]he credibility of a witness may be impeached by proving mental derangement or insanity but only if such mental incapacity exists at the time

---

test was material under *Brady* because the polygraph results may have led defense counsel to additional information which may have been used at trial. In reversing, the Court did not declare that admissibility was a precondition to materiality. The Court proceeded to sift through the record and, after examining the possible effects that the undisclosed polygraph results would have had on the outcome of the trial, concluded that the information was not material. 116 S.Ct. at 10-11. The Court reiterated the traditional *Brady* standard that evidence is material "only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Id.* at 10. Thus, the Court did not hold that admissibility of undisclosed evidence is a prerequisite to materiality. Accordingly, *Wood* does not conflict with our decision in *Spaziano.*

10

the witness takes the stand to testify or at the time he observed the facts to which he has testified on direct." Charles Gamble, McElroy's Alabama Evidence § 141.01(1) (3d ed.1977).

There is no evidence that Lambert was using drugs when she testified at Wright's trial or when Wright told her that he killed the Greens. Nor is there any evidence that Lambert was suffering any mental incapacity when she testified or when Wright confessed to her. The district court found evidence that Lambert suffered from depression several years before the Greens's murders, but it found no evidence that Lambert suffered from depression during trial or when Wright confessed to her. Notwithstanding the fact that Lambert admitted to using drugs occasionally between Wright's confession and trial, the district court found no evidence that her occasional drug use impaired her faculties. These findings are not clearly erroneous.

Moreover, even if the Lambert evidence had been admitted at trial, the evidence would have had little impact on the jury's perception of her credibility. Mr. Pennington cross-examined Lambert and elicited from her that she had been convicted of shoplifting and that she was Wright's *former* girlfriend and had a son Wright fathered. *See* Trial Transcript, Doc. 12, Vol. 1, p. 174-75. Mr. Pennington also questioned Lambert's mother who stated that she told her daughter not to come to trial and tell a "bunch of lies." *Id.,* Vol. 2, p. 291. Thus, Mr. Pennington was able to call Lambert's credibility into question during his examination. Moreover, this evidence does not rise to the level of "mental derangement or insanity," nor does it establish the type of drug problem that produces an impaired mind. *See* McElroy's Alabama Evidence; *Leonard,* 551 So.2d at 1147. In short, the Lambert evidence would not have been admissible at Wright's trial, and even if it had been admitted, it would have had little bearing on the credibility of her testimony. Accordingly, we conclude that this evidence is not material.

c.      The McQueen agreement.

Wright alleges that the State and Roger McQueen secretly agreed that McQueen would plead to a lesser charge and testify against Wright at trial. Wright also alleges that McQueen perjured himself at trial

11

by testifying that he planned to plead guilty to first degree murder instead of second degree murder. Wright relies on McQueen's testimony at the federal evidentiary hearing to support these contentions.

The district court found that the McQueen agreement could have been used to impeach McQueen at trial; but that the potential impact of any possible impeachment would have been *de minimis*. This is true in light of Mr. Pennington's cross-examination of McQueen at trial. Pennington attempted to impeach the credibility of McQueen by eliciting from him his previous convictions for grand larceny and arson and his admission to the use of drugs on the day of the robbery. McQueen even openly admitted to being high the morning of the robbery-murders. *See* Trial Transcript, Doc. 12, Vol. 1, p. 198-201. Additionally, even if the McQueen agreement would have totally discredited McQueen, the State still had the testimony of Craig and Lambert, in combination with the physical evidence, to support Wright's conviction. Moreover, when McQueen testified at the federal evidentiary hearing on Wright's behalf, the district court found that McQueen's testimony was not credible. *See* ROA, Vol. 8, p. 172.

McQueen testified at trial that he planned to plead guilty to first degree murder and armed robbery; however, at the federal evidentiary hearing, the State presented testimony that proved that McQueen, in exchange for truthful testimony, would be prosecuted for less than capital murder. *Id.* at p. 99, 185, 209. Thus, the outcome of Wright's trial would not have been different if McQueen had told the jury that he planned to plead guilty to second degree murder rather than first degree murder. Both charges are less than capital murder charges and do not have the same attendant sentence.

Wright further argues that the documents he introduced into evidence at the federal evidentiary hearing establish that the State had a secret deal with McQueen. A review of the hearing transcript, however, reveals that the State's witnesses disproved the existence of such a deal. An entry contained in McQueen's court file shows he was convicted of second degree murder and sentenced to 20 years imprisonment, to run consecutive with a sentence he was serving in Mississippi. ROA, Vol. 8, Folder 6, Petitioner's Exh.'s 15 & 16. This document is consistent with the testimony of the State's witnesses who stated that McQueen's

sentence was to run consecutively with the Mississippi sentence. ROA, Vol. 8, p. 100, 209. Wright still argues that prosecutors promised McQueen that he would not have to serve his sentence in Alabama and that he did not serve that sentence. *Id.* at p. 175. However, McQueen mentioned in his testimony that the district attorney later had a detainer issued so that he could begin serving his sentence for his participation in the robbery-murders. *Id.* This testimony and the documentary evidence negate any claim Wright has that the State and McQueen had a secret deal. Accordingly, Wright cannot demonstrate prejudice to overcome his procedural default.

Cumulatively, the Stroh affidavit, Lambert evidence, and McQueen agreement do not undermine confidence in the verdict. *See Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Most of the items would have been inadmissible at trial, and the others would not have changed the outcome of the trial. Accordingly, Wright has not demonstrated prejudice from his failure to raise these claims in state court. This court could consider Wright's claims however, if they fall within the "narrow class of cases ... implicating a fundamental miscarriage of justice." *Schlup v. Delo,* 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting *McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (internal quotation marks omitted)). A fundamental miscarriage of justice occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 321, 115 S.Ct. 851 (quoting *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. 2639) (internal quotation marks omitted).

Wright cannot establish by a fair probability that no reasonable juror would have found him guilty in light of all the evidence which he alleges was wrongfully suppressed. See *Schlup,* 513 U.S. at 329, 115 S.Ct. 851. At trial, the State called several witnesses who testified extensively to Wright's participation in the robbery-murders. Lambert testified that Wright confessed to killing two people with a gun at a Western Auto Store. McQueen admitted to his participation in the crimes and testified that at the time of the crimes, Wright possessed a .38 caliber handgun. McQueen further stated that upon entering the getaway vehicle, Wright told the other members of the robbery team that he shot the Greens. McQueen testified that after

13

Wright made this statement, Wright handed McQueen two expended bullet cartridges to prove that he had killed the Greens. Craig's testimony substantially corroborated McQueen's. Craig further testified that after the commission of the crimes, he saw Wright with a gold Seiko watch that was later identified as Mr. Green's. The State also produced physical evidence that linked Wright to the robbery-murders.

Wright maintains that he is innocent but does not mention his alibi defense that he proffered at trial. He attempts to establish his innocence by shifting the focus to Roberts. Wright alleges that Roberts murdered the Greens and that McQueen and Craig are covering for Roberts by implicating Wright; however, Wright offers no evidence to support this contention. The allegedly suppressed items of evidence do tend to raise some question as to whether Roberts may have been involved in the robbery-murders. Indeed, this evidence originally prompted the State to indict Roberts. Wright must go further, however, and show that in light of this new evidence, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* The allegedly suppressed material does not satisfy this standard. At the federal evidentiary hearing, McQueen testified that everything he previously told the police was true except for the fact that Wright did not murder the Greens. McQueen makes no reference to Roberts being present at the robbery-murders and did not say who actually shot the Greens. Accordingly, a reasonable jury could find Wright guilty of killing the Greens. Wright cannot overcome his procedural default on the remaining *Brady* claims.

B.      Ineffective Assistance of Counsel claims

Wright asserts numerous instances of ineffective assistance of counsel but he only raised four of them in the state courts. The claims that Wright did not raise in the state courts are procedurally defaulted, *see Footman v. Singletary,* 978 F.2d 1207, 1211 (11th Cir.1992), so we will only review them if Wright can show cause and prejudice or a fundamental miscarriage of justice. *See Agan v. Vaughn,* 119 F.3d 1538, 1548-49 (11th Cir.1997), *cert. denied,* --- U.S. ----, 118 S.Ct. 1305, 140 L.Ed.2d 470 (1998). For Wright to show cause, the procedural default "must result from some objective factor external to the defense that prevented

14

[him] from raising the claim and which cannot be fairly attributable to his own conduct." *McCoy v. Newsome,* 953 F.2d 1252, 1258 (11th Cir.1992) (quoting *Carrier,* 477 U.S. at 488, 106 S.Ct. 2639). Under the prejudice prong, Wright must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *Id.* at 1261 (quoting *Carrier,* 477 U.S. at 494, 106 S.Ct. 2639). The district court found that Wright had not demonstrated cause and prejudice to excuse his procedural defaults. On appeal, Wright provides the court with no explanation or evidence to establish cause and prejudice. Accordingly, these remaining claims of ineffective assistance of counsel are barred from federal habeas review.[2]

The district court correctly determined that only four instances of ineffective assistance of counsel were properly before the court for review: (1) whether counsel was ineffective in allegedly failing to investigate Roberts's involvement in the robbery-murders; (2) whether counsel was ineffective in failing to raise a *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objection at trial; (3) whether counsel was ineffective for failing to obtain a transcript of Wright's first trial which ended in a mistrial; and (4) whether counsel was ineffective for failing to challenge on direct appeal the trial court's grant of the State's motion in limine regarding the arrest and indictment of Roberts. In order to prevail on his claim of ineffective assistance of counsel, Wright must show that counsel's performance fell below an objective standard of

---

[2]These claims were presented in Wright's federal habeas petition and delineated as ineffective assistance for (1) failing to adequately investigate and prepare for trial; (2) failing to compel disclosure of all evidence relating to the handgun the ballistics expert had previously identified; (3) failing to adequately challenge and otherwise establish the systematic under-representation of blacks, women and other cognizable groups in the jury pool; (4) failing to object to improper voir dire questioning; (5) failing to cross-examine Craig, McQueen or Detective Tillman as to any deals between Craig or McQueen and the State; (6) failing to cross-examine Lambert regarding any deals she received from the State; (7) failing to seek a continuance or mistrial so he could testify regarding his prior conversation with Lambert and to obtain testimony from Tinsley; (8) failing to call other alibi witnesses at trial; (9) failing to object to numerous improper jury instructions; (10) failing to bring to the court's attention the fact that Craig's former girlfriend stated that Craig told her that he and McQueen committed the murders; (11) failing to object to repeated improper and leading questioning by the prosecutor, irrelevant and prejudicial testimony, improperly stipulating to the expert qualifications of witnesses, and failing to object to improper comments by the trial judge; (12) ineffective assistance at sentencing; and (13) ineffective assistance on appeal.

reasonableness, and that the deficient performance prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "When applying *Strickland,* we are free to dispose of ineffectiveness claims on either of its two grounds." *Oats v. Singletary,* 141 F.3d 1018, 1023 (11th Cir.1998).

1. Wright alleges that his trial counsel was ineffective for failing to investigate Roberts's alleged involvement in the robbery-murders. On collateral review, the state trial court found that counsel's failure to investigate Roberts's alleged involvement in the robbery-murders was the result of a strategic decision based on Pennington's skill and reputation, and his prior knowledge that Roberts was the focus of the police investigation of the Greens's murders. The Alabama Court of Criminal Appeals found that the record supported the trial court's findings and denied Wright any relief on this claim. *See Wright v. State,* 593 So.2d at 116-17. The district court relied on the state court's findings on this claim to deny Wright any relief. Wright argues that the state courts and the district court erred in finding that Pennington's failure to investigate Roberts's alleged involvement in the robbery-murders was the result of a strategic choice because in both the state coram nobis hearing and the federal evidentiary hearing, Pennington categorically denied that he made a strategic decision not to investigate. ROA, Vol. 3, Folder 3, p. 32-45; Vol. 8, p. 51.

Although Pennington denied making a strategic decision not to investigate Roberts's alleged involvement in the robbery-murders, the record contradicts this assertion. Pennington admitted knowing that Roberts had been indicted for the same offense as Wright and knowing who had represented Roberts. ROA, Vol. 8, p. 55, 57. When asked why he did not pursue inquiry into the State's case against Roberts, Pennington answered, "I had other avenues to pursue concerning the remainder of my defense for Freddie Wright." *Id.* at 57. Pennington knew that Mary Johnson was on his witness list because he requested that she be. *Id.* at 82. He reluctantly admitted that he knew that Mary Johnson had some tie to Wright's case. *Id.* at 83. Pennington admitted that he had to make choices in defending a client based on factors such as time, information, and what his client told him. *Id.* Thus, Pennington admitted to the process of making strategic

16

decisions. "[B]ecause ineffectiveness is a question which we must decide, admissions of deficient performance by attorneys are not decisive." *Harris v. Dugger,* 874 F.2d 756, 761 n. 4 (11th Cir.1989). The record persuades us that Wright's trial counsel was not ineffective for failing to investigate Roberts's alleged involvement in the robbery-murders.

2. Wright argues that his counsel was ineffective for failing to raise a *Batson* objection at trial and in failing to supplement the record on appeal with a *Batson* challenge. Pennington testified at the federal evidentiary hearing that no blacks sat on Wright's jury and that he knew that the State used several of its peremptory strikes to remove black persons from the jury. ROA, Vol. 8, p. 68. At the state coram nobis hearing, Pennington stated that he did not object to the State's use of its peremptory strikes because the law was very developed and the Alabama Supreme Court had ruled that peremptory strikes could be used for any reason. ROA, Vol. 3, Folder 3, p. 38-39.

In *Poole v. United States,* 832 F.2d 561, 565 (11th Cir.1987), we held that counsel was not ineffective for failing to raise a *Batson* objection prior to the issuance of that case. In so holding, we stated that "[t]he Supreme Court has held that '*Batson v. Kentucky* is an explicit and substantial break with prior precedent,' *Allen v. Hardy,* [478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) ], so that 'the rule in *Batson* should not be available to petitioner on federal habeas corpus review of his convictions.' " 832 F.2d at 565. Since Wright's trial occurred before *Batson,* Wright is not entitled to relief on this claim.

Wright's other *Batson*-related claim—that counsel was ineffective for failing to supplement the record on appeal with a *Batson* challenge—is not properly before our court for review. Wright did not argue this to the district court. We will not consider claims not properly presented to the district court and which are raised for the first time on appeal. *See Cotton v. U.S. Pipe & Foundry Co.,* 856 F.2d 158, 162 (11th Cir.1988).

3. The only other issue of ineffective assistance that Wright asserts on appeal is his claim that counsel was ineffective during the penalty phase of his trial. This claim is procedurally defaulted. *See Footman,* 978

17

F.2d at 1211.  With regard to the other claims of ineffective assistance which Wright presented in the state courts and are not procedurally barred, Wright does not separately address these claims in his brief on appeal. Wright contends at the conclusion of his brief that he is entitled to relief on all claims raised in his federal habeas petition.  Therefore, we must consider the other two claims of ineffective assistance of counsel which are not procedurally barred from our review.

These claims are whether counsel was ineffective for failing to obtain a transcript of Wright's first trial and whether counsel was ineffective for failing to challenge on appeal the trial court's grant of the State's motion in limine regarding the arrest and indictment of Roberts.  Since Wright cannot demonstrate why his counsel's failure to obtain a transcript of his first trial affected the outcome of his second trial, he is not entitled to relief on this claim.  As to his claim that counsel should have objected on appeal to the trial court's grant of the State's motion in limine, Wright fails to demonstrate how the result of his appeal would have been different had counsel objected.  Accordingly, Wright is not entitled to relief on these claims of ineffective assistance of counsel.

C.      *Batson* claim

Wright contends that the State used its peremptory strikes in a racially discriminatory manner in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).  The district court correctly determined that Wright procedurally defaulted this claim because he did not raise a substantive *Batson* claim at trial, or on direct appeal, or in his state coram nobis proceeding.  To excuse his procedural default, Wright must show cause and prejudice.  *See Weeks v. Jones,* 26 F.3d 1030, 1043 (11th Cir.1994).

Wright urges this court to overlook his procedural default because the Alabama courts have not regularly and consistently applied a procedural bar to cases where a *Batson* claim was not raised on direct appeal.  Wright relies on this court's decision in *Cochran v. Herring,* 43 F.3d 1404 (11th Cir.), *modified on reh'g,* 61 F.3d 20 (1995), to support his contention.  In *Cochran,* this court found that "where the trial took place pre-*Batson,* a properly made *Swain* claim made in a pre-trial motion is treated as a timely made *Batson*

objection for the purpose of preserving the *Batson* issue for appeal." 43 F.3d at 1409 n. 7. This court noted

that the Alabama Supreme Court in *Ex parte Floyd,* 571 So.2d 1234 (Ala.1990), allowed a defendant to raise

a *Batson* claim in a postconviction motion because he had raised a *Swain* objection at trial. Cochran was

identically situated to Floyd, and we concluded that the Alabama state courts had applied its procedural rules

inconsistently when it allowed Floyd to proceed with his *Batson* claim but denied Cochran that right.

Although Wright's case does share some similarities with Cochran's—both cases were tried

*pre-Batson* and *Batson* was decided while their direct appeals were pending—there is one fatal flaw in

Wright's reliance on *Cochran:* Wright never made a *Swain* objection. His counsel even conceded at the

federal evidentiary hearing that there was no *Swain* claim presented to the district court. ROA, Vol. 8, p. 75-

76. Wright's case is more similar to *State v. Tarver,* 629 So.2d 14, 18-19 (Ala.Crim.App.1993), in which the

Alabama Court of Criminal Appeals held that Tarver was procedurally barred from raising a *Batson* claim

in a post-conviction hearing because Tarver did not preserve the claim for appellate review by making a

*Swain* objection at trial (*Batson* was decided while the case was on direct appeal). As such, Wright

procedurally defaulted his substantive *Batson* claim.

Wright also encourages this court to overlook his procedural default of his *Batson* claim by arguing

that the state courts addressed the merits of the *Batson* claim. Although Wright concedes that he did not

expressly raise in state court an independent *Batson* claim, he contends that the state court heard testimony

on this claim and ruled on the underlying merits of the claim. Wright relies on a portion of the trial court's

order denying his coram nobis petition. Wright overlooks the preceding paragraph of the order in which the

trial court stated that "[t]he petitioner recognizes that he cannot raise a claim under *Batson* ... for the first time

in this proceeding...." ROA, Tab 43 at 33. The trial court then discussed the claim of ineffective assistance

of counsel for failing to raise a *Batson* claim. Additionally, there is no mention of a substantive *Batson* claim

in his brief on appeal from the denial of his error coram nobis petition, and the Alabama Court of Criminal

Appeals does not mention a substantive *Batson* claim in its opinion. *See Wright v. State,* 593 So.2d 111. As

19

the record demonstrates, the state courts never addressed a substantive *Batson* claim. Accordingly, Wright cannot demonstrate cause and prejudice to excuse his procedural default for failing to raise a substantive *Batson* claim to the state courts, and therefore, we will not consider the merits of the claim.

D.      The Preclusion Clause claim

When Wright was tried and convicted, the Alabama Death Penalty Act contained a preclusion clause which prohibited the jury in capital cases from convicting the defendant of a lesser included offense. In *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court struck down this clause as unconstitutional. Then in *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court held that a defendant convicted under Alabama's 1975 Death Penalty Act was entitled to a new trial if evidence presented at trial suggests that the trial court could have charged a lesser included offense or if the defendant suggests a plausible alternative theory that was not contradicted by his own testimony at trial. The state courts held that Wright's own testimony contradicted this claim that the court should have charged a lesser included offense because he called an alibi witness. The state courts concluded that there was no evidence presented at trial upon which a conviction of a lesser included offense could have been based. The district court agreed and so do we.

Wright contends that the state courts and the federal district court erred in finding that there was no evidence to support a charge of a lesser included offense. The two items upon which Wright relies for this assertion are Lambert's testimony that "they" had killed the Greens, not "he," and testimony of the State's ballistics expert who conceded that he had previously identified another handgun as the murder weapon. Wright claims that this evidence would have permitted the jury to convict him of a lesser included offense under the theory that he was present at the crime but he was not the triggerman.

First, Wright's reliance on Lambert's use of the pronoun "they" does not support his argument that the jury should have been instructed on lesser offenses. This reliance ignores the bulk of Lambert's testimony in which she stated that Wright told her that *he* killed two people in a Western Auto Store. Her testimony

20

was clarified by questioning from the State. *See* Trial Transcript, p. 166. Thus, Lambert's one-time incorrect usage of the pronoun "they" does not support a lesser offense charge. Second, Wright does not provide the court with any reason why the testimony from the State's ballistics expert should support a lesser charge instruction. It appears, at most, to support Wright's alibi defense.

Next, Wright contends that if not for the preclusion clause, he could have presented an alternative plausible claim that he was a member of the robbery team but not the triggerman. Although Wright did not testify, he presented a witness, Carl Harrington, who stated that he was with Wright the morning of the robbery-murders. This alibi defense negates any "plausible claim" that the defendant could have still been a member of the robbery team, but not the triggerman, so Wright was not entitled to a lesser included offense instruction. *See Alldredge v. State,* 431 So.2d 1358, 1361 (Ala.Crim.App.1983) (alibi defense inconsistent with lesser included offense instruction). Moreover, Wright cannot show that the preclusion clause prevented him from asserting a lesser included offense defense. *See Hopper,* 456 U.S. at 613-14, 102 S.Ct. 2049; *see also Ritter v. Smith,* 726 F.2d 1505 (11th Cir.1984). Thus, Wright cannot show that he was prejudiced by the existence of the preclusion clause.

E.      Remaining claims

Wright asserts on appeal that he is entitled to relief on the remaining issues raised in his federal habeas petition. Most of his claims are procedurally defaulted because they were not presented in the state courts.[3] Several other issues were considered by the Alabama Court of Criminal Appeals and found to be procedurally barred under state procedural rules. *See Wright v. State,* 593 So.2d at 118-19. These claims are barred from federal review unless Wright provides the court with evidence demonstrating cause and prejudice

---

[3]Wright did challenge the trial court's refusal to give certain requested jury instructions in his federal habeas petition and on direct appeal. The Alabama Court of Criminal Appeals addressed this issue and found it to be without merit. *See Wright v. State,* 494 So.2d at 732. Our review of the record leads us to the same conclusion.

to overcome these procedural defaults.  *Johnson v. Singletary,* 938 F.2d 1166, 1174-75 (11th Cir.1991). Wright has failed to do so;  therefore, we will not consider these claims on the merits.

For the foregoing reasons, we affirm the judgment of the district court denying habeas relief to Wright.

AFFIRMED.